Filed 11/30/23  P. v. Tellechea CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MATTHEW RYAN TELLECHEA et al.,<br><br>    Defendants and Appellants. | D080090<br><br><br><br>(Super. Ct. No. SCD277475) |

APPEALS from judgments of the Superior Court of San Diego County, Michael S. Groch, Judge.  Michael's judgment is affirmed; Matthew's judgment is affirmed as modified.

Jeanine G. Strong, for Defendant and Appellant Matthew Ryan Tellechea.

Patrick M. Ford, for Defendant and Appellant Michael Saul Tellechea.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C, Ragland, Assistant Attorney General, A. Natasha Cortina, Christine L. Bergman, and Lynne G. McGinnis, Deputy Attorneys General for Plaintiff and Respondent.

Defendants Matthew Ryan Tellechea (Matthew) and Michael Saul Tellechea (Michael) appeal judgments after their jury convictions of various criminal offenses, including arson, assault, receiving a stolen vehicle, and attempted extortion. Michael was also convicted of attempted murder, among other offenses. Michael was sentenced to a term of 56 years, eight months. Matthew was sentenced to a term of 10 years, eight months. Michael and Matthew appealed their judgments.

In his appeal, Michael contends: (1) the trial court erred by finding the attorney-client privilege did not apply to preclude the testimony of Andrea B. regarding his communications with her; (2) the prosecution committed outrageous governmental conduct by pressuring Andrea to reveal his communications with her that were protected by the attorney-client privilege; (3) the court erred by excluding evidence that certain witnesses received immunity for their testimony and modifying a jury instruction to omit a grant of immunity as a factor that the jurors could consider in weighing the credibility of a witness; (4) the court erred by excluding evidence regarding an affair that Andrea had with another person; (5) the prosecution committed prejudicial error during its opening statement by showing a slide that displayed the words "felons in possession" adjacent to the defendants' photographs and presenting an exhibit at trial (exh. 36) that displayed the defendants' photographs adjacent to two screen shots from a surveillance video recording showing two individuals fleeing from a burning vehicle; (6) the prosecution committed error under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) by not disclosing to him the entire video recording of the shooting incident; and (7) cumulative errors denied him his right to a fair trial. He also joins in Matthew's contentions on appeal.

In his appeal, Matthew contends: (1) the trial court erred by finding the attorney-client privilege did not apply to preclude the testimony of Andrea regarding his communications with her; (2) the court erred by denying his motion to sever his trial from Michael's trial or, alternatively, have separate juries for their joint trial; (3) the court erred by excluding evidence that certain witnesses received immunity for their testimony and modifying a jury instruction to omit a grant of immunity as a factor that the jurors could consider in weighing the credibility of a witness; (4) the court erred by excluding evidence regarding an affair that Andrea had with another person; (5) the prosecution committed prejudicial error by presenting an exhibit at trial (exh. 36) that displayed the defendants' photographs adjacent to a screen shot from a video recording of the shooting incident showing two individuals fleeing from a burning vehicle; (6) substantial evidence does not support his conviction of receiving a stolen vehicle; (7) the court erred by allowing his niece to read an irrelevant and inflammatory letter at his sentencing hearing; (8) cumulative errors denied him his right to a fair trial; and (9) the court erred in imposing certain assessments and fines.  He also joins in Michael's contentions on appeal.

As explained below, we conclude that the trial court erred by excluding evidence that certain witnesses received immunity for their testimony and modifying a jury instruction to omit a grant of immunity as a factor that the jurors could consider in weighing the credibility of a witness, but nevertheless conclude that those errors were harmless.  We also conclude that the court erred by imposing on Matthew incorrect assessments and fines and therefore modify his judgment accordingly.  We reject the remaining contentions made by Michael and Matthew.  Therefore, we affirm Michael's judgment and affirm, as modified, Matthew's judgment.

3

## FACTUAL AND PROCEDURAL BACKGROUND

*Laura C.* In 2013 or 2014, Matthew met Laura C. in Ocean Beach, where they both lived. Matthew later introduced her to Michael, his identical twin brother, and he became romantically involved with her. After her relationship with Michael ended, Laura remained friends with both of them. In 2017, her father died in an airplane accident and she thereafter received about $2 million from a wrongful death action. Laura gave her friends expensive gifts and bought Harley Davidson motorcycles, clothes, and furniture for Michael and Matthew. She also paid their rent.

On December 1, 2017, Matthew accompanied Laura to a car dealership where she bought two Range Rover vehicles, placing a white one in her name and a blue one in Matthew's name. When her vehicle needed repairs, Laura took it back to the dealership and left it there. A few days later, either Michael or Matthew went to the dealership and picked up Laura's vehicle without her permission. The dealership's finance manager who had sold the two vehicles to Laura did not know whether she had given Michael or Matthew permission to pick up her vehicle.

Also in December 2017, Laura, who was on parole, was arrested at Michael's and Matthew's home for not checking in with her parole officer. Her arrest at their home angered them, causing their relationship with her to deteriorate. Thereafter, they stole a $5,000 annuity check that she had received. Later that month, Michael, Matthew, and Laura drove to Las Vegas and stayed at an expensive hotel. Michael and Matthew were verbally and physically abusive to Laura, called her names, threatened to kill her boyfriend and dog, smashed glasses and dishes and threw them at her, and dragged her over the broken glass. They demanded money from her and told her that when they received the money they deserved, "it would all be over."

They also placed her cell phone, keys, identification, and cash in the hotel safe and refused to give her the combination. When Laura was standing near the hotel room's balcony, Michael hit her in the face, held her over the railing, and told her that he would "fucking kill" her.

After they checked out of the hotel, Michael and Matthew forced Laura to withdraw a total of $100,000 from three bank branches. When they left Laura alone for a while, she had a friend pick her up.

On or about December 15, Matthew texted Laura and insisted that she pay for his dental work. She agreed to do so provided that he return her white Range Rover to her. After initially claiming that Michael took her car, Matthew promised, "I'll get it to you. We good?" Laura then paid $58,000 for his dental work. However, when she went to pick up her vehicle, Michael blamed Laura for a burst blood vessel in his eye and asked her for more money.

On January 6, 2018, Laura received a call from Robert B., an acquaintance of Michael's and Matthew's, during which he purported to agree to a previous request she made to kill the brothers for a price. Michael and Matthew made a video recording of Robert's call to Laura and thereafter sent her the recording, along with messages threatening to disclose the recording if she did not pay them money and do as they asked her. In particular, Matthew presumably sent Laura a text message, stating: "Now hit-for-hire is an ugly crime. [Robert] said on the audio, Laura I can take care of your problem and off the Tellechea brothers. [¶] Pay HUD his money and Mikey and I our[s]. You owe me any ways. LOL. You're truly the dumbest bitch in

America."[1] That text message also threatened that Matthew and Michael would "call their home boys at the MC [apparently referring to their motorcycle club]" if Laura did not pay them more money. They also rejected her requests that they return her Range Rover and other personal property to her, and Matthew also demanded more money from her.

Also, on January 29, Michael and Matthew drove their motorcycles onto the front lawn of Laura's home and threw a softball-sized rock through one of its windows, leaving shards of glass on the floor.[2] On February 13, Matthew sent Laura a text message, calling her a "pig" and stating, "Don't throw rocks at glass houses. LOL." Laura later testified that the brothers' text messages to her were frightening, demanding, relentless, and vile.

On April 2, Laura left another of her vehicles, a Chevy Silverado truck, parked outside of an auto repair shop in the evening so that it could be repaired there in the morning. At about 4:00 a.m. on April 3, persons near the repair shop reported hearing sounds like explosions and saw smoke coming out of its garage. Investigating, a neighbor saw that the Silverado was on fire. The exterior of the repair shop was also burned. A neighbor's surveillance camera recorded two unidentified persons running away from the Silverado. Investigators determined that the fire was deliberately set by a person pouring a flammable liquid over the truck's exterior and lighting it.

Later that day (on April 3), Michael sent Matthew a link to a news article about the fire. Matthew replied, "[T]he news, that is pretty funny."

---

[1] Based on that text message's use of the phrase "Mikey and I," the jury could reasonably have inferred, and we also therefore infer, that it was Matthew, and not Michael, who sent that text message to Laura.

[2] Because their DNA is identical, it was impossible from the DNA found on the rock to determine whether it was Michael or Matthew who had thrown the rock.

Michael texted him back, "I drove by the mess and wow, it is a mess." The brothers also took videos of themselves at the scene of the truck fire.

At about 1:40 a.m. on June 21, the brothers went into the backyard of Laura's home. One held a handgun, while the other held a large rifle. They fired two shots, and Laura called the police.

*Robert B.* Robert B. met Michael and Matthew a few years earlier when they were all in custody in the county jail. After their release, Robert reconnected with the brothers in the Ocean Beach area where they all lived, and they maintained contact. The brothers told Robert that Laura was in jail and had inherited $2 million and asked him to look after her so that she stayed away from her ex-boyfriend and did not resume using drugs. Robert became acquainted with Laura and, after her relationship with the brothers worsened, she asked Robert to obtain a firearm for her so she could protect herself from them. Instead, Robert told Matthew about her request. On January 7, 2018, the brothers drove to the home where Robert was staying and told him they were taking him for a drive. Feeling threatened, Robert complied, but brought a knife along with him. On the drive, the brothers showed Robert videos of their trip with Laura to Las Vegas. The brothers insisted that Robert call Laura and told him what to tell her. Feeling threatened, Robert complied and called Laura, which call the brothers recorded (as discussed above). Immediately prior to the call, the brothers recorded the following preface by Michael: "This is ah, me and my brother, I'm, I'm Michael Tellechea and my brother Matthew. Tellechea calling this Laura [C.] that's supposed to be um, be putting a, whatever on us. A kill on us, so we're gonna see what she says before we can um, do what, what we gotta do. So I, this is us listening to her." Their recording (referred to by the

7

parties as the "hit video") of Robert's call to Laura included the following
conversation:

> "[Laura:]  Hello.
>
> "[Robert:]  Hello, hey.  [¶]  . . . My homeboy's coming
> through, anyway, check this out.  I got what you need.
>
> "[Laura:]  Oh, you what?
>
> "[Robert:]  I got what you need.
>
> "[Laura:]  Oh cool.  Uh, well um, I am busy right now.  I
> can't, I, I, 'cause I cannot um, join you or do anything.
>
> "[Robert:]  Okay well, check, check this out.  I can get your
> problem solved.  And have both Tellecheas whacked.
>
> "[Laura:]  You're what?
>
> "[Robert:]  Have it done.  Your problem gettin' rid of.
>
> "[Laura:]  Okay, right on.
>
> "[Robert:]  Ah do you, do you want to do this?
>
> "[Laura:]  What?
>
> "[Robert:]  Do you want to do this?  Or, ya know what I
> mean?  It'll cost a little cash.
>
> "[Laura:]  I can't. . . .
>
> "[Robert:]  It'll cost a little cash.
>
> "[Laura:]  I can't right now.
>
> "[Robert:]  Excuse me?  You can't talk?
>
> "[Laura:]  I cannot right now.
>
> "[Robert:]  Okay, when can, can we talk?  I'll call you back.
>
> "[Laura:]  Um, yeah. . . .
>
> "[Robert:]  I'll just call you back.  Bye.
>
> "[Laura:]  Bye."

Shortly after the call, Robert told the brothers that he would "smoke the
fucking bitch."  Michael replied: "No, no.  Call her.  I want her on video.  This

8

isn't going to the cops, this is going right to my MC [apparently referring to his motorcycle club] right now, dog." Robert then tried to call Laura again, but his call went to her voicemail.

Shortly after Robert made the call, Michael told Robert that he wanted to fight him and Matthew suggested they get out of the car to fight. Michael got into the backseat where Robert was sitting and struck him. Michael then placed his fist on Robert's throat, choking him. When Robert asked whether he was serious, Michael replied that he was going to "merk" (presumably meaning murder) him. Frightened, Robert stabbed Michael in the stomach with the knife he brought. In turn, Michael and Matthew stabbed Robert in his leg and hands. Bleeding, Michael told Matthew to shoot Robert. However, Robert convinced Matthew to take Michael and him to the hospital. The three men agreed to explain to others that Robert's and Michael's injuries were caused by unknown men who approached and stabbed them at a bonfire.

On January 9, Robert wrote a letter describing the incident and his fear of retaliation by the brothers. His letter warned that if anything happened to him, the brothers were responsible for it. After the incident, Michael and Matthew drove by Robert's home almost daily, making loud noises with their motorcycles.

On or about April 3, Robert learned that Laura's truck had been set on fire and expressed his belief to Marc P., his roommate, that Michael and Matthew had caused the fire and that he (Robert) would be their next victim. At about 1:00 a.m. on April 5, Robert saw a ball of light outside his home, asked Marc for help, and ran outside to see his Ford F-150 pickup truck on fire. Robert and Marc saw a white SUV driving away from the scene. Unable

9

to put out the fire with a garden hose, Robert jumped into the truck while a neighbor helped push it out of the driveway.[3]

*Marc P.* As the white SUV fled the scene, Marc got in his black Cadillac and followed the SUV as it headed toward Michael's and Matthew's home. Marc then saw the SUV parked on the right side of an alley with its front passenger's door open. He stopped his Cadillac behind the SUV and turned off his car's ignition. Four or five shots were then fired at Marc's passenger's window. Marc drove away, ramming the SUV twice to make room in the alley to do so.

Nicholas N. and Michael E., nearby residents, heard the Cadillac and white SUV crash, tires screeching, and gunshots. Nicholas N. saw a man, whom he recognized as either Michael or Matthew, standing in the alley and holding a silver revolver. Michael E. called 911 to report the incident. A third neighbor saw two men, dressed in black, leave Michael's and Matthew's yard, walk down the alley, and then return to their yard.

Responding to the 911 call, a police officer saw the white SUV backing up in the alley. The officer detained Michael, its driver. Another officer detained Matthew, who was standing nearby. One particle of gunshot residue was found on Michael's right hand, while none was found on Matthew's hands.[4] Officers found Robert's abandoned Cadillac one block from the scene. Its right front passenger's window was shattered, its

---

[3]  Arson investigators later found that Robert's truck had been set on fire using three gasoline-soaked towels. They also found a dog bed near the rear tire that smelled of gasoline and had the DNA of either Michael or Matthew on it.

[4]  The presence of gunshot residue means that the person discharged a firearm, was near a firearm, or touched a surface with gunshot residue on it.

passenger's door had bullet damage, and its front end was damaged. A bullet had also damaged the steering wheel.

*Jeshua R.* In March or early April of 2018, Jeshua R., who lived across the street from Michael and Matthew, spoke to one of them regarding their noisy Subaru that they let idle several times a day. Their response was that the car's idling was going to be Jeshua's problem and not theirs. On May 5, the brothers threw four or five bags of trash from the alley into Jeshua's yard, crushing his vegetable garden. Later that day, he asked the brothers to not do that again, explaining he was not responsible for the trash bags. They called him a "punk" and a "pussy." When he asked them how they would like it if he had thrown trash in their yard, Michael or Matthew replied, "I'll light you up." The other brother picked up a softball-sized rock and stated, " 'I've done time. I'll cave your fucking skull in. I'll take this rock here and end you.' " Afraid for his safety, Jeshua called the police and later purchased a home surveillance system for protection against the brothers.

*Darryl D.* On May 22, 2018, Darryl D. and his business partner were visiting San Diego from out of state. That evening, they went to a restaurant and then Darryl left to find a place to buy cigarettes. As he stepped into a crosswalk, a black Range Rover, occupied by Michael and Matthew, drove through it without slowing down. Darryl held out his arms with his palms up. In response, the driver displayed an obscene gesture. As Darryl walked back toward the restaurant, the driver parked the Range Rover, got out, chased Darryl, and spit on him. Darryl went back inside the restaurant.

Later, Darryl left the restaurant again and went to a Rite Aid store, planning to buy a bottle of water there. However, the brothers were inside the store and saw Darryl. Approaching customers in the cashier's line, Matthew aggressively stated: "You guys are spectators. Did you see what he

11

did?" Michael then began beating Darryl, who fell to the ground. During a pause in the beating, Matthew told Michael: " 'Hit him again. Hit him harder.' " A customer asked Michael to stop hitting Darryl and asked him why he would do that. Michael stated something to the effect: " 'Did you see what he did to me?' " His answer made no sense to the customer because Darryl had done nothing that would have caused a fight. Darryl was knocked unconscious and could not remember being beaten. He suffered severe pain, a laceration above his eyelid, cracked teeth, facial disfigurement, and other injuries.

*Andrea B.* In 2015, Andrea was a deputy alternate public defender and represented Michael in a criminal case in which Matthew was a codefendant. The brothers were acquitted on the charges against them. Afterward, Michael moved to Michigan to start a new life. Andrea kept in contact with him and gave him her personal cell phone number. In January 2017, Michael returned to San Diego and he and Andrea began an intimate relationship.

In November 2017, Andrea and Michael signed a lease for an Ocean Beach apartment in which he and his brother would live. Michael had told Andrea about Laura and claimed he needed to move because she had been arrested at his old home where he was trying to start a bicycle business. Andrea had a family and her own home and never spent a night at the apartment.

In December, after the brothers' trip with Laura to Las Vegas, Michael showed Andrea a video of Laura and their hotel room. He told Andrea he had become angry at Laura for partying, grabbed Laura by the throat, and planned to push her off the balcony. He stated he made the video that showed Laura looking happy to prove he was not attempting to extort her.

12

He also told Andrea about Laura's inheritance and his taking her to bank branches in Las Vegas.

On January 7, 2018, Andrea visited Michael in the hospital after Robert stabbed him. Michael told her that Robert stabbed him because Laura hired him to do so. He showed Andrea the hit video of Robert's phone call with Laura. He told Andrea he lied to police that he was stabbed while in a fight with a couple of Hispanic men because he did not want to be labeled as a snitch. Michael also told her that he had the white Range Rover as a "trophy" because Laura owed it to him for the stabbing. When Andrea asked Michael about Laura's annuity check that she saw on the floor of his room, he stated he obtained it from Laura's mailbox. Michael also told Andrea that he and Matthew went to Laura's home, threw rocks through her windows, hitting her piano, and laughed about how large the rocks were.

At about 6:30 a.m. on April 3, Michael texted Andrea telling her that he set a truck on fire and stating, " 'Hey, please watch the news. Channel 7. It's coming up in Point Loma. There was a car fire. Please watch. It's amazing. It's coming up next.' " Matthew sent her a video of Michael and himself at the scene of the truck fire. The video showed both brothers laughing as fire truck lights flashed in the background. A couple of days later, the brothers drove Andrea by the charred auto repair shop and Michael stated, " 'That's where we lit the truck on fire.' " Michael told her about the truck fire and the shooting involving Robert and Marc, stating that the brothers went by a "meth house" and lit Robert's truck on fire. Michael stated that the people from the house were upset and chased him and he fired shots. Michael played video of the incident taken by their home surveillance camera, but she did not save a copy of the video.

13

On April 30, Michael called Andrea and told her he had just beaten up someone at a Rite Aid store. He stated the man's face was busted and his hands hurt from hitting the man's face. She refused Michael's request to give him a ride home.

Andrea's relationship with Michael began to deteriorate in January 2018 after he accused her of being intimate with Matthew and then smashed her bicycle with a sledge hammer, stating he would do the same thing to her children's heads. Shortly thereafter, Michael ordered Andrea to purchase ammunition for him at a gun store. When she refused, Michael grabbed her by the throat and pushed her into the gutter. In the following days, he sent her text messages calling her derogatory names and threatening to tell her husband and work supervisor about their relationship. At the end of January, Michael demanded that Andrea buy him a gun, but she declined at first. She knew he was a convicted felon and was prohibited from possessing firearms. However, on February 4, after Michael had repeatedly made that demand, Andrea accompanied him to a sporting goods store and purchased a dark silver .357 revolver for him. She later regretted her decision and asked that he return the gun to her. Making a gun-firing motion with his hand, Michael replied: " 'This is what I have on you.' " Thereafter, Michael continued to ask Andrea for favors and threatened her. In particular, Michael had her rent a storage unit for him and attempted to have her provide him with an alibi for the shooting incident.

In early June, Andrea went on a road trip with Michael in an attempt to help their relationship. During the trip, Michael screamed at her and placed his hands over her mouth and throat. That night, Michael texted her, apologizing for his actions.

14

On June 29, after Michael and Matthew had been arrested, police found guns, rifles, ammunition, and magazines in the storage unit that Andrea rented with Michael. When police found the revolver that Andrea bought for Michael, she was also arrested. On August 7, Andrea (then represented by counsel) had a "free talk" with law enforcement and representatives of the San Diego County District Attorney's Office. On August 23, she had a second free talk and agreed to plead guilty to one felony count in exchange for testifying at Michael's and Matthew's trial and, if her testimony was truthful, the District Attorney's Office would not oppose a grant of probation to her.[5] There was no agreement regarding the substance of her testimony.[6]

---

[5]     However, if her testimony was not truthful, she would receive a sentence of four years in prison.

[6]     On October 4, 2022, Michael filed a request that we take judicial notice of certain court records from the criminal case against Andrea, reflecting actions taken *after* the judgment was entered against him. In particular, he requests that we take judicial notice of: (1) a minute order, dated October 13, 2020, issued at a hearing in Andrea's criminal case, reflecting the parties' stipulation that documents lodged by defense counsel were to be destroyed after that hearing; (2) a Penal Code section 1203.4 petition filed by Andrea on February 4, 2022, requesting that her guilty plea and October 12, 2018 felony conviction be set aside and the complaint against her be dismissed in the interest of justice; and (3) an order for dismissal, dated February 4, 2022, which order granted Andrea's petition, set aside and vacated her guilty plea and felony conviction, and dismissed the complaint against her. On October 21, 2022, we issued an order stating that we would consider Michael's request for judicial notice concurrently with his appeal.

On October 16, 2023, Michael filed another request for judicial notice, seeking judicial notice of excerpts from the reporter's transcript from an unidentified criminal trial involving different criminal charges, which trial occurred *after* the judgment was entered in this case. He argues that those excerpts are relevant to our consideration of his *Brady* contention in this

*Nicholas E.* Nicholas E. was Matthew's jail cellmate and agreed to testify at the brothers' trial. He and Matthew discussed the crimes the brothers committed between January and May of 2018. Matthew told him about Laura, her inheritance, their trip to Las Vegas, and making her withdraw money from several banks. Matthew described how he and Michael had placed their hands on Laura and held her off the balcony. Matthew also described how he set multiple vehicles on fire, placing gasoline on them, lighting them with a torch, and recording one of the incidents. Matthew also discussed Michael's relationship with Andrea and how she bought guns for them because their criminal records prohibited them from doing so. Matthew also described how Michael shot at Marc with a revolver while he recorded him and claimed Michael shot at Marc because he crashed into their Range Rover.

Matthew described in detail the Darryl D. incident to Nicholas E. He stated he and Michael were driving by a Rite Aid store when Darryl walked

appeal. On October 20, the People filed their opposition, arguing that the excerpts from that subsequent trial are irrelevant to our consideration of his *Brady* contention. On October 26, we issued an order stating that we would consider Michael's second request for judicial notice concurrently with his appeal.

Because, as Michael concedes, all of the documents and excerpts from the reporter's transcript submitted with his two requests for judicial notice reflect actions, discussions, or testimony that occurred after the instant judgment was entered against him, we now deny his October 4, 2022 and October 16, 2023 requests for judicial notice. Michael does not show that any exceptional circumstances exist that would justify our divergence from the general rule that reviewing courts will not take judicial notice of facts not presented to the trial court. (Evid. Code, §§ 452, subd. (d)(1), 459, subd. (a); *Weiss v. City of Del Mar* (2019) 39 Cal.App.5th 609, 625; *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 [absent exceptional circumstances, reviewing courts generally do not take judicial notice of facts or evidence not presented to the trial court].)

in front of their car and cursed at them. Later, inside the store, they saw Darryl again, exchanged words, and a fight occurred. Michael punched Darryl, who fell to the floor, and Michael hit him one more time. Matthew asked Nicholas E. to testify at their trial and state that he had witnessed the incident and that Darryl was responsible for the altercation. Matthew drew a map of the store for him and gave him a written script for what to say. Matthew promised to pay him $10,000 for his testimony.

However, after Nicholas E. was released from custody in November 2018, he declined to comply with Matthew's request. Matthew then contacted his mother and another inmate to persuade Nicholas E. to comply. Matthew also wrote a letter to Nicholas E., ordering him to "do what you and I agreed to do" and suggesting harm would come his way if he did not. Nicholas E. instead gave the map, script, and letter to law enforcement.

*Amended information.* On October 26, 2021, a second amended information was filed, charging both Michael and Matthew with the following offenses: (1) vandalism of property worth less than $400 (count 1; Pen. Code, § 594, subds. (a), (b)(2)(A))[7]; (2) arson of a structure (count 2; § 451, subd. (c)); (3) arson of property (counts 3 & 4; § 451, subd. (d)); (4) making a criminal threat (count 6; § 422)); (5) assault by means of force likely to produce great bodily injury (count 7; § 245, subd. (a)(4)); (5) possession of a firearm by a felon (count 8; § 29800, subd. (a)(1)); (6) drawing or exhibiting a firearm (count 9; § 417, subd. (a)(2)); (7) receiving stolen property (count 11; § 496, subd. (a)); (8) receiving a stolen vehicle (count 12; § 496d)); and (9) attempted

---

[7] All further statutory references are to the Penal Code unless otherwise specified.

extortion (count 13; § 524)).[8] The second amended information charged Michael (but not Matthew) with the additional offenses of: (1) attempted murder (count 5; §§ 664, 187, subd. (a)); (2) possession of a firearm by a felon (counts 10 & 14; § 29800, subd. (a)(1)); (3) possession of ammunition by a prohibited person (count 15; § 30305, subd. (a)(1)); (4) battery of a current or former significant other (count 16; § 243, subd. (e)(1)); (5) making a criminal threat (count 17; § 422)); and (6) infliction of corporal injury on a current or former spouse or roommate (count 18; § 273.5, subd. (a)).

The second amended information further alleged that: (1) in committing count 2, Michael and Matthew used a device designed to accelerate the fire (§ 451.1); (2) in committing count 4, Michael was armed with a firearm and Matthew was vicariously armed with a firearm (§ 12022, subd. (a)(1)); (3) in committing count 5, Michael intentionally and personally discharged a firearm (§ 12022.53, subds. (b), (c)); (4) in committing count 7, Michael personally inflicted great bodily injury on the victim (§§ 1192.7, subd. (c)(8), 12022.7, subd. (a)); and (5) Michael had one prior serious felony conviction (§ 667) and one prior strike conviction (§§ 667, subds. (b)-(i), 1170.12).

*Trial.* At Michael's and Matthew's joint jury trial, Michael presented the defense testimony of an accident reconstruction expert witness to the effect that Marc had intentionally struck the Range Rover, thereby supporting an argument that the shooting may have been in self-defense.

The jury found Michael guilty on 15 counts and not guilty on two counts (i.e., counts 8 & 9), and additionally found true the allegations related to counts 2, 4, and 5. The jury found Matthew guilty on counts 1, 2, 4, 6, 7,

---

[8] Before the jury began its deliberations, the trial court granted the defense motion to dismiss, and dismissed, count 3.

12, and 13, and additionally found true the allegations related to counts 2 and 4. After Michael waived a jury trial on the prior conviction allegations, the trial court conducted a bench trial on, and found true, those allegations.

*Sentencing.* On January 24, 2022, the court sentenced Michael to a prison term of 56 years and eight months. The court sentenced Matthew to a prison term of 10 years and eight months. Michael and Matthew filed notices of appeal challenging their judgments.

DISCUSSION

I

*Trial Court Did Not Err by Finding Andrea B.'s Testimony*
*Was Not Precluded by the Attorney-Client Privilege*

Michael and Matthew contend that the trial court erred by finding the attorney-client privilege did not apply to preclude Andrea B. from testifying regarding their communications with her.

A

Michael and Matthew filed a joint pretrial motion seeking to exclude from evidence their conversations with Andrea based on the attorney-client privilege. Their motion summarized statements they had made to her between January 2017 and June 2018 and argued those statements were made in the course of their attorney-client relationship with her. They argued that after Michael moved to Michigan following his 2015 acquittal, Andrea offered to help him with anything he needed and thereafter obtained records for him, which she sent to the probation department, helping him terminate his probation. She contacted Michael using her personal email address and asked him to call her at her alternate public defender phone number. After his arrest, Michael told his mother that Andrea was still his attorney. During the investigation of the shooting, Michael referred to Andrea as his attorney and told investigators that it was her decision

19

whether he would allow them to swab his hands for evidence. Also, during her interview with investigators, Andrea stated that Michael might believe that she was his attorney. She admitted that she had used legal databases to gather information for Michael and Matthew, including an inmate locator tool and PACER. She gathered legal documents and research for them and regularly checked whether certain individuals were government informants.

Their motion also stated that Andrea had represented Michael in several traffic cases and Matthew in one traffic case, advised them regarding a potential libel action against a newspaper, and offered to help them regarding a rent dispute. She helped them in their dispute with Laura by contacting law enforcement, filing a request for a restraining order, informing Michael regarding what crimes Laura may have committed, and, at his request, calling Laura's former counsel. In addition, they argued that the prosecutors had engaged in outrageous government conduct in violation of their Fifth and Sixth Amendment rights by questioning her regarding their statements while knowing there was an attorney-client privilege, which violation required dismissal of all of the charges against them.

In support of their motion, Michael and Matthew submitted various exhibits, including a letter and documentation regarding Matthew's plea in an April 2018 traffic matter and declarations by Michael and Matthew. Their declarations stated that Andrea had advised them on legal issues and searched government databases on their behalf and that they would not have made statements in confidence to her unless she was acting as their attorney.

In opposing their motion, the prosecution noted that Andrea had represented Michael and another attorney had represented Matthew at their 2015 criminal trial involving charges for kidnapping for ransom, torture, and other offenses. After they were both acquitted, Michael moved to Michigan,

20

but returned to San Diego in January 2017. Thereafter, Andrea helped Michael by giving him money, co-signing a lease, renting a storage unit with him, cleaning their home, and taking care of their dog. She asked Michael to call her on her personal cellphone and not at her privileged work phone line. The prosecution asserted that Michael and Matthew never spoke of Andrea as being their attorney. Instead, Michael asked her to find out which attorney would be representing him and talk to that attorney. She agreed to do so as a friend.

The prosecution stated that Andrea had helped Michael and Matthew with traffic matters, looked up witnesses for Michael, filed a police report using her personal address and phone number, and, after Michael threatened her, obtained restraining orders for Michael and herself against Laura. She also had purchased guns, ammunition, and motorcycle parts for Michael. However, the prosecution argued that Andrea had initially helped Michael and Matthew only as a friend and thereafter because she was afraid of them. It argued that she had not helped the brothers in her capacity as their attorney. It argued that even if there had been an attorney-client relationship with the brothers, some of their communications with her would be admissible under the crime-fraud exception.

Following arguments by the parties, the trial court denied Michael's and Matthew's motion to exclude their statements to Andrea. Citing *People v. Gionis* (1995) 9 Cal.4th 1196 (*Gionis*), the court noted that a person's communications with an attorney, even if involving a legal matter, are generally not protected by the attorney-client privilege if the communications have no relation to a professional relationship between that person and the attorney. Under Evidence Code section 952, the court noted that the attorney-client privilege applies only if a person seeks advice from an

21

attorney in his professional capacity. The court found that Michael and Matthew had not met their burden to show that their statements to Andrea were made in the course of an attorney-client relationship within the meaning of Evidence Code sections 951 and 952. In so finding, the court considered, inter alia, Andrea's unequivocal belief that she expressed during her free talks with the prosecution that there was no attorney-client privilege that precluded her disclosure of the brothers' statements to her. The court also considered threats made by Michael to disclose Andrea's actions to her alternate public defender office, which threats may show his tacit acknowledgement that her actions were improper and could get her fired, and therefore could be construed as contradicting his claim that he was legitimately consulting her for a professional legal opinion. Based on its finding that Andrea did not have an attorney-client relationship with Michael or Matthew, the court concluded that the attorney-client privilege did not apply to preclude her testimony regarding statements that they made to her and therefore her testimony regarding their statements would be admissible at trial.

B

"The attorney-client privilege, set forth at Evidence Code section 954, confers a privilege on the client 'to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer. . . .' The privilege 'has been a hallmark of Anglo-American jurisprudence for almost 400 years.' [Citation.] Its fundamental purpose 'is to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual legal matters." (*Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 732 (*Costco*). "The party claiming the privilege has the burden of establishing

22

the preliminary facts necessary to support its exercise, i.e., a communication made in the course of an attorney-client relationship.  [Citations.]  Once that party establishes facts necessary to support a prima facie claim of privilege, the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish the communication was not confidential or that the privilege does not for other reasons apply.  [Citations.]" (*Id*. at p. 733.)

As *Costc*o stated, the client holds the privilege to prevent the disclosure of confidential communications between the client and his or her attorney. (*Costco*, *supra*, 9 Cal.4th at p. 732; Evid. Code, § 954.)  Although the client holds the attorney-client privilege, the client's attorney has a duty to claim that privilege on his or her behalf.  (Evid. Code, §§ 954, 955.)  Evidence Code section 951 defines a " 'client' " as "a person who . . . consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him *in his professional capacity* . . . ."  (Italics added.)  Evidence Code section 952 provides that the phrase " 'confidential communication between client and lawyer' " means "information transmitted between a client and his or her lawyer *in the course of that relationship* and in confidence by a means which, so far as the client is aware, discloses the information to no third persons . . . and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship." (Italics added.)  "[T]he attorney-client privilege does not require that the attorney actually be retained.  '[W]here a person seeks the assistance of an attorney with a view to employing him professionally, any information acquired by the attorney is privileged whether or not actual employment results.' [Citations.]" (*Gionis*, *supra*, 9 Cal.4th at p. 1208.)  Importantly, "no attorney-client relationship arises for purposes of the privilege if a person consults an attorney for nonlegal services

23

or advice in the attorney's capacity as a friend rather than in his or her professional capacity as an attorney. [Citation.]" (*Kerner v. Superior Court* (2012) 206 Cal.App.4th 84, 117 (*Kerner*).)

"On appeal, the scope of judicial review is limited. 'When the facts, or reasonable inferences from the facts, shown in support of or in opposition to the claim of privilege are in conflict, the determination of whether the evidence supports one conclusion or the other is for the trial court, and a reviewing court may not disturb such finding if there is any substantial evidence to support it [citations].' [Citation.]" (*Gionis*, *supra*, 9 Cal.4th at p. 1208.)

C

Michael and Matthew contend that the trial court erred by concluding the attorney-client privilege did not apply to preclude Andrea from testifying regarding their statements to her. In particular, they argue that substantial evidence does not support the court's finding of fact that they did not have an attorney-client relationship with her at the time they made those statements to her. We disagree.

Based on our review of the record, we conclude there is substantial evidence to support the trial court's finding that Andrea did not have an attorney-client relationship with either Michael or Matthew from 2016 through 2018 and therefore the attorney-client privilege did not apply to preclude her testimony regarding their statements to her during that period. In particular, there is substantial evidence to support the court's implied finding that Michael's and Matthew's statements were not made to Andrea for the purpose of retaining her as their lawyer or securing legal service or advice from her in her professional capacity or otherwise in the course of an attorney-client relationship within the meaning of Evidence Code section 954,

24

but instead their statements were made to her in the course of some other relationship (e.g., friendship or personal) and/or for other purposes (e.g., their coercion of her to take actions on their behalf). (*Costco*, *supra*, 9 Cal.4th at p. 733; cf. *Gionis*, *supra*, 9 Cal.4th at p. 1212; *Kerner*, *supra*, 206 Cal.App.4th at p. 117.) As she informed investigators during her free talks, Andrea represented Michael in his 2015 criminal case during which their relationship was entirely professional. Thereafter, Michael moved to Michigan. In December 2016, Michael called Andrea at her office and they discussed personal, and not legal, matters. After a few calls, Andrea gave him her personal cellphone number for him to make calls. In January 2017, Michael returned to San Diego and soon thereafter they began a romantic relationship.

Michael began to request that Andrea assist Matthew and him by performing various tasks for them. First, he asked her to find out whether one of Matthew's fight victims, known as "Bones," was on probation or parole. Without using any of her work resources, Andrea created a PACER account, but did not find out any useful information from it. Michael also complained to Andrea that Laura came to his house in order to avoid probation or parole and, as a result, she ruined his bicycle business. Andrea helped Michael find another apartment and placed her name on the lease. Also, when Matthew had a warrant for his arrest, Andrea told him to contact the public defender's office to get it recalled.

Andrea performed many personal favors for the brothers, including giving Michael money to start another bicycle business and giving him between $1,500 and $2,000 to buy a Subaru, which she placed in her name and for which she paid the insurance. She bought motorcycle parts for Michael and paid his gas and electric bills.

However, as Andrea told investigators, the reasons for her assistance to Michael and Matthew transitioned from friendship and romance to, instead, fear of retaliation by them. In January 2018, after Michael was stabbed by Robert, Michael told her to buy him ammunition. When she refused, Michael grabbed her by the hair and pushed her onto the street. Later, outside Andrea's home, Michael called her and began smashing her bicycle. He told her that "if you hear what I'm doing now, that's gonna be your head because you're not helping me" and that he "was gonna go through [her] children's heads."

At Michael's request, Andrea (presumably as a named lessee and without identifying herself as an attorney) called Laura's parole officer after Michael told her that Laura had broken into his home and thrown trash in his yard. Andrea later requested a restraining order against Laura to make Michael believe that her efforts to help him were more genuine. Threatening to go to Andrea's work office and harm her children, Michael demanded that she give him phone numbers for her work supervisor or her husband. Afraid because of his threats, Andrea instead created a Google voice account and told him it was her husband's number.

After Michael used the gun Andrea purchased for him in the shooting incident, he ordered her to rent a storage unit and threatened that, if she did not do so, she would get in trouble if the police came to his home. She complied and rented a storage unit in her name. Also, at Michael's request, Andrea reviewed the public Facebook page of a man with whom he was having issues. When he asked her to do something about the "hit video," Andrea told him that he needed to contact the police.

We conclude that the evidence discussed above, along with the other evidence submitted to the court in support of or in opposition to Michael's and

26

Matthew's motion, constitutes substantial evidence to support the court's finding that Andrea did *not* have an attorney-client relationship with either Michael or Matthew during the January 2017 through June 2018 period. To the extent Michael and Matthew cite evidence and inferences therefrom that would have supported a contrary finding, they misconstrue and/or misapply the substantial evidence standard of review. As discussed above, when the evidence, or reasonable inferences from the evidence, shown in support of or in opposition to a claim of attorney-client privilege are in conflict, the determination of whether the evidence supports one finding or the other is for the trial court, and a reviewing court may not disturb its finding if there is any substantial evidence to support it. (*Gionis*, *supra*, 9 Cal.4th at p. 1208.)

Substantial evidence is not synonymous with any evidence or a mere scintilla of evidence, but is only evidence that is of ponderable legal significance, reasonable in nature, credible, and of solid value. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005–1006.) The testimony of a single credible witness may constitute substantial evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 (*Mix*).) In applying the substantial evidence standard of review, we accept all evidence, and all reasonable inferences therefrom, to support the trial court's finding and do not determine whether there is substantial evidence to support a contrary finding. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581–582 (*Schmidt*).) In deciding a pretrial motion, like at a bench trial, the trial court is the sole judge of witness credibility and may disregard the testimony, contradicted or uncontradicted, of any witness if there is any rational ground for doing so. (*Id.* at p. 582; *People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*).)

Here, Michael and Matthew cite evidence and inferences therefrom that arguably would support a contrary finding that they had an attorney-client relationship with Andrea. In particular, they cite, among other things, evidence showing that Andrea used her work computers to check for outstanding warrants, viewed videos of the attempted murder of Marc and other incidents, and advised them on eviction procedures and libel law. However, the court could reasonably have inferred that those actions by Andrea arose strictly out of her friendship with them and/or romantic relationship with Michael and not out of an attorney-client relationship. Also, the court could infer that many of her later actions were coerced by them through acts of violence or threats of violence or other retribution, causing her to be fearful for herself or others if she did not comply with their requests, which inference supports its finding. To the extent Matthew notes that Andrea represented him in traffic and misdemeanor cases, the court could reasonably infer that those isolated and relatively minor acts were unrelated to the charged offenses in this case, did not result in any general or continuing attorney-client relationship between Andrea and him, and/or were coerced by violence or threats of violence, which inferences support its finding that the attorney-client privilege did not apply to preclude the admission of his statements to her. Furthermore, although Michael told his mother in a July 2018 recorded jail phone call that he always considered Andrea to be his attorney, that statement alone (whether deemed self-serving or not) does not refute the trial court's finding, based on all of the other evidence, that she was not, in fact, in an attorney-client relationship with him during the relevant period. In sum, because there is substantial evidence to support the trial court's finding that Andrea had no attorney-client relationship with either Michael or Matthew, the court properly denied their pretrial motion to

28

exclude their communications with her based on an attorney-client privilege.[9]  (Evid. Code, § 952; *Gionis*, *supra*, 9 Cal.4th at p. 1208; *Kerner*, *supra*, 206 Cal.App.4th at p. 117.)

## II

### *No Outrageous Governmental Conduct*

Michael contends, and Matthew joins in his contention, that because he had an attorney-client relationship with Andrea, the prosecutor and his investigators committed outrageous governmental conduct by questioning Andrea during her free talks about his communications with her.  However, because the premise of his contention is faulty, we reject his contention.

### A

A criminal defendant's constitutional due process rights may be violated if the government "help[s] instigate or orchestrate a breach of the [attorney-client] privilege."  (*People v. Navarro* (2006) 138 Cal.App.4th 146, 159 (*Navarro*).)  To prove such a violation, a defendant must show: "(1) the government objectively knew a lawyer-client relationship existed between the defendant and its informant; (2) the government deliberately intruded into that relationship; and (3) the defendant was prejudiced as a result."  (*Id*. at p. 160.)

### B

Here, Michael's claim of outrageous governmental conduct was properly rejected by the trial court because it found that he did not have an attorney-client relationship with Andrea when he made the purported

---

9     Contrary to Michael's and Matthew's apparent assertion, the trial court did not rely on any purported "bragging exception" to the attorney-client privilege in denying their motion.  Rather, it denied their motion based on the absence of an attorney-client relationship at the time their communications to Andrea were made.

privileged communications to her and, as we concluded above, substantial evidence supports that finding. Therefore, Michael failed to prove any of the three requirements for outrageous governmental conduct. (*Navarro*, *supra*, 138 Cal.App.4th at p. 160.)

### III

### *Denial of Matthew's Motion to Sever Trial*

Matthew contends that the trial court erred by denying his motion to sever his trial from Michael's trial or, alternatively, have separate juries for their joint trial. We disagree.

### A

Matthew filed a pretrial motion requesting that the court sever his trial from Michael's trial, arguing that Michael might testify at a joint trial and implicate him, the prosecution's case against Michael was stronger than against him, and there was a possibility that he and Michael could pursue adverse trial strategies. Matthew alternatively requested that the court empanel separate juries for Michael and him if there were a joint trial. Matthew argued that a limiting instruction would be inadequate to protect him from the potential prejudicial effect of a joint trial.

The prosecutor opposed the motion and argued that because the attempted murder of Marc and many other events involved both Michael and Matthew and the same witnesses, a joint trial was appropriate even though some of the charged offenses involved only Michael.

The court denied Matthew's motion, stating that although his right to a fair trial was of paramount importance, it was confident that the jurors at a joint trial would follow its instructions. It noted that most the charged offenses, and the evidence to prove those offenses, involved both defendants. The court concluded that the underlying conduct of the charged offenses

30

against Michael only was not so prejudicial as to preclude the jury from properly considering the evidence on Matthew's charged offenses. The court further concluded that separate juries at the joint trial was unnecessary because it would repeatedly admonish the jury when evidence was admissible against only one of the defendants.

B

Section 1098 provides:

> "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials. In ordering separate trials, the court in its discretion may order a separate trial as to one or more defendants, and a joint trial as to the others, or may order any number of the defendants to be tried at one trial, and any number of the others at different trials, or may order a separate trial for each defendant . . . ."

Section 1098 expresses the Legislature's preference for joint trials by providing that two or more defendants jointly charged with crimes must be tried together unless the court orders separate trials. (*People v. Anderson* (2018) 5 Cal.5th 372, 386 (*Anderson*).) For example, joint trials may be often preferable when the defendants' conduct arises out of a single chain of events. (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 242.) "Joint trials promote efficiency and help avoid inconsistent verdicts." (*People v. Sanchez* (2016) 63 Cal.4th 411, 464 (*Sanchez*).) Nevertheless, a trial court "has discretion to order separate trials if there is an incriminating confession, prejudicial association, likely confusion due to evidence on multiple counts, conflicting defenses, or the possibility that a codefendant might provide exonerating testimony at a separate trial. [Citation.] Prejudicial association might exist 'if the characteristics or culpability of one or more defendants [is] such that the jury will find the remaining defendants guilty simply because

31

of their association with a reprehensible person, rather than assessing each defendant's individual guilt of the crimes at issue.' [Citation.]" (*Ibid*.) Alternatively stated, a trial court generally should grant a motion to sever if charges against a codefendant are highly inflammatory or if a relatively weak case against the defendant is joined with a strong case against a codefendant, which likely would have a spillover effect in the jury's determination of the defendant's guilt. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1283; *People v. Soper* (2009) 45 Cal.4th 759, 774–775; *People v. Mendoza* (2000) 24 Cal.4th 130, 161.)

On appeal, we review a trial court's decision whether to sever a trial of multiple defendants for abuse of discretion based on the facts as of the time of its ruling. (*Anderson*, *supra*, 5 Cal.5th at pp. 386–387.) If we conclude the trial court properly denied a motion to sever a trial, we may reverse a judgment only if we conclude the joint trial caused gross unfairness that denied due process to the defendant. (*Id*. at p. 387.)

C

Based on our review of the record as of the time the trial court considered Matthew's motion to sever his trial from Michael's trial, we conclude the court did not abuse its discretion by denying his severance motion. Although the trial court had discretion to sever Matthew's trial, the court could reasonably conclude that he had not shown the existence of any circumstances warranting severance of his trial. As discussed above, a trial court has discretion to order separate trials if there is an incriminating confession, prejudicial association, likely confusion due to evidence on multiple counts, conflicting defenses, or the possibility that a codefendant might provide exonerating testimony at a separate trial. (*Sanchez*, *supra*, 63 Cal.4th at pp. 463–464.) First, although Michael made many confessions or

32

other statements that incriminated Matthew (e.g., Michael's communications with Andrea regarding many of the incidents), the court could reasonably conclude that Matthew had not shown that those incriminating confessions or statements would be inadmissible against him in a separate trial. Rather, the court presumably concluded that those confessions or other statements were admissible against Matthew because they were against Michael's penal interest. (Evid. Code, § 1230.) To the extent Matthew argues Michael's confessions or other statements to Andrea would have been excluded based on his attorney-client relationship with her, we rejected his argument above that he had an attorney-client relationship with Andrea and therefore the attorney-client privilege would not have precluded the admission of statements made by either Michael or Matthew to her at a separate trial for Matthew.

Second, the court could reasonably conclude that Matthew did not show that he would be unfairly prejudiced by his association with Michael at a joint trial. Here, as reflected in the factual and procedural background section above, most of the offenses and related incidents in this case involved both Michael and Matthew. For example, based on the information's allegations and evidence submitted in support of or opposition to the parties' pretrial motions, the court could reasonably conclude that evidence would be presented at trial showing that Michael and Matthew threw a rock through Laura's window, set fires to the auto repair shop and Robert's truck, received the stolen $5,000 check from Laura's mailbox, received Laura's stolen Range Rover, attempted to extort property from Laura, threatened Jeshua, and assaulted Darryl. Given the multitude of common crimes, events, and victims, the court could reasonably conclude a joint trial was appropriate for Michael and Matthew and, contrary to Matthew's assertion, that there was

33

minimal, if any, possibility of a spillover or prejudicial effect against him for those offenses that were charged against only Michael. Contrary to Matthew's apparent assertion, separate trials are not required whenever a codefendant's bad acts are admissible. (*People v. Mackey* (2015) 233 Cal.App.4th 32, 102 (*Mackey*).) In particular, although only Michael was charged with the attempted murder of Marc, Matthew's conduct before and after Michael's gunshots in the alley would nevertheless have been admissible against Matthew in a separate trial. As the evidence admitted at their joint trial showed, both Michael and Matthew were involved in setting Robert's truck on fire and then fleeing in the white Range Rover, which Marc pursued and followed into the alley. After Michael then fired shots at Marc, both Michael and Matthew fled together and were later detained by police. Therefore, even had they been separately tried, the jury presumably would have learned about the shooting incident. Likewise, while only Michael physically assaulted Laura, evidence of his conduct could have been admitted against Matthew at a separate trial to explain the pattern of, and context for, Michael's and Matthew's offenses and other misconduct against Laura. (Cf. *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1175 [upholding of denial of severance motion where codefendant's conduct would likely have been admitted at defendant's separate trial to show motive and context for defendant's actions].)

Finally, Matthew's motion did not appear to argue, and the court could reasonably conclude Matthew had not shown, that he and Michael would present conflicting defenses at trial or that Michael would have provided testimony exonerating him if his trial were severed from Michael's trial. (*Sanchez, supra,* 63 Cal.4th at pp. 463–464.) Accordingly, we conclude that

34

the court did not abuse its discretion by denying Matthew's motion to sever his trial from Michael's trial. (*Anderson*, *supra*, 5 Cal.5th at pp. 386–387.)

Furthermore, we conclude that Matthew has not carried his burden on appeal to show the joint trial caused him gross unfairness that denied him his right to due process. (*Anderson*, *supra*, 5 Cal.5th at p. 387.) Based on our review of the record, there was ample independent evidence to support Matthew's convictions, including, among other things, Matthew's admissions to Nicholas E., his own text messages, and the testimony of victims of his crimes. Also, the court admonished the jury that when evidence was admitted against only one defendant, it must consider that evidence against only that defendant. Therefore, when certain exhibits were admitted against only Michael, we presume the jury followed that admonition and did not consider them in deciding Matthew's guilt. (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1326 [reviewing court presumed that jurors followed trial court's limiting instructions].) Also, the court gave limiting instructions when two prosecution witnesses testified regarding only Michael and again in its jury instructions on conclusion of the trial. We conclude that those limiting instructions were sufficient to cure any risk of prejudice to Matthew from evidence admitted at the joint trial regarding only Michael. (Cf. *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40.) Also, because the jury acquitted Matthew on three counts (counts 8 [possession of a firearm by a felon], 9 [brandishing a firearm at Laura], and 11 [receiving stolen property]), we conclude the jury's verdicts show it carefully differentiated among the charges and between Michael and Matthew. (Cf. *Mackey*, *supra*, 233 Cal.App.4th at p. 105.) Therefore, we conclude that there is no reasonable probability that Matthew would have obtained a more favorable result at a separate trial and he was not denied his right to due process or a fair trial.

35

Accordingly, we conclude that the trial court did not abuse its discretion by denying Matthew's severance motion (or by denying his mistrial motion based on its denial of his motion) and, in any event, Matthew has not carried his burden on appeal to show the joint trial resulted in gross unfairness which denied him his right to due process or a fair trial.[10] (*Anderson, supra,* 5 Cal.5th at p. 387; *People v. Homick* (2012) 55 Cal.4th 816, 848.)

IV

*Trial Court's Errors in Excluding Evidence and Improperly Instructing on Grants of Immunity to Witnesses Were Harmless*

Michael and Matthew contend that the trial court prejudicially erred by excluding evidence that certain witnesses were granted immunity for their testimony and modifying a jury instruction to omit a grant of immunity as a factor that the jurors could consider in weighing the credibility of a witness. The People concede that the court erred as they contend, but argue those errors were harmless and do not require reversal of their judgments.

A

At trial, outside the presence of the jury, three prosecution witnesses (i.e., Laura, Marc, and Robert) invoked their Fifth Amendment privilege against self-incrimination. The court granted each of the three witnesses immunity regarding their testimony and ordered them to testify. The court then ordered the parties to not make any reference to the witnesses' invocation of their Fifth Amendment privilege or its grants of immunity in questioning them.

---

10    To the extent Matthew alternatively contends that the trial court abused its discretion by not granting his request for separate juries at his joint trial, we conclude he has waived or forfeited that contention because his appellant's opening brief does not set forth any substantive legal analysis showing the court so abused its discretion. (*Magic Kitchen LLC v. Good Things Internat., Ltd.* (2007) 153 Cal.App.4th 1144, 1161.)

Outside of the jury's presence, the court discussed the proposed jury instructions. In discussing CALCRIM No. 226, Michael's counsel noted that the proposed version included whether "the witness [was] promised immunity or leniency in exchange for his or her testimony," among the various factors that the jurors could consider in deciding a witness's credibility, but that the court had precluded him from questioning the prosecution's witnesses regarding the court's grants of immunity to them. Because he was precluded from questioning them regarding grants of immunity, he argued the proposed instruction would suggest to the jurors that the prosecution's witnesses had testified without any grants of immunity. The court inquired whether counsel wanted the words "immunity or" deleted from the proposed instruction. Matthew's counsel stated it was his preference that the instruction be modified to inform the jury that the witnesses were, in fact, granted immunity for their testimony, which instruction would be appropriate so long as defense counsel did not mention those witnesses' invocations of their Fifth Amendment privilege. However, the court rejected his suggested modification and instead deleted the words "immunity or" from its instruction with CALCRIM No. 226.[11]

---

11    On conclusion of the trial, the court instructed the jury, among other things, with its modified version of CALCRIM No. 226 in pertinent part as follows: "You alone, must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have. [¶] You may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe. [¶] In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors you may consider are: [¶] . . . [¶] [ ] Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with

B

Evidence Code section 913, subdivision (a) provides, among other things, that neither the trial court nor counsel may comment on a witness's exercise of his or her privilege not to testify and a jury may not draw any inference therefrom as to the credibility of a witness. Pursuant to that statute, our Supreme Court held that a defendant does not have a right to compel a witness to exercise his or her Fifth Amendment privilege in the presence of the jury. (*People v. Mincey* (1992) 2 Cal.4th 408, 441.) It has also held that a trial court does not have a duty to instruct a jury that a witness has exercised that privilege.

Although a witness's exercise of his or her Fifth Amendment privilege to not testify may not be disclosed to the jury by the court or counsel, a trial court's grants of immunity to witnesses in order to obtain their testimony may be disclosed to the jury and "considered as evidence of interest or bias in assessing the credibility of prosecution witnesses." (*People v. Price* (1991) 1 Cal.4th 324, 446 (*Price*).) In particular, on counsel's request, jury instructions on considerations regarding the credibility of witnesses should include the fact that a witness has been granted immunity from prosecution. (*People v. Hampton* (1999) 73 Cal.App.4th 710, 721 (*Hampton*); *People v. Echevarria* (1992) 11 Cal.App.4th 444, 450 (*Echevarria*); but see *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19 [although jury was informed of witness's immunity agreement, jury instruction adequately addressed that

_____

someone involved in the case, or a personal interest in how the case is decided? [¶] . . . [¶] [ ] Did the witness admit to being untruthful? [¶] [ ] Has the witness been convicted of a felony? [¶] Has the witness engaged in other conduct that reflects on his or her believability? [¶] [ ] Was the witness promised leniency in exchange for his or her testimony?"

factor by instructing jurors to consider witness's "bias, interest, or other motive"]; *People v. Johnsen* (2021) 10 Cal.5th 1116, 1158 [same].)

C

Michael and Matthew contend, and the People concede, that the trial court erred by initially precluding them from questioning Laura, Marc, and Robert during their trial testimony regarding their grants of immunity and later instructing the jury with a modified version of CALCRIM No. 226 that deleted the words "immunity or" in its listing of factors the jury could consider in evaluating a witness's credibility. We agree that the court so erred. Although the court correctly precluded counsel from referring to those witnesses' exercise of their Fifth Amendment privilege against self-incrimination (Evid. Code, § 913, subd. (a)), the court erred by precluding counsel from questioning those witnesses regarding its grants of immunity to them in order to obtain their trial testimony. (*Price, supra*, 1 Cal.4th at p. 446.) The court further erred by instructing the jury with a modified version of CALCRIM No. 226 that omitted its grants of immunity to those witnesses as a factor the jury could consider in evaluating their credibility. (*Hampton, supra*, 73 Cal.App.4th at p. 721; *Echevarria, supra*, 11 Cal.App.4th at p. 450.)

D

Although the trial court erred as discussed above, contrary to Michael's and Matthew's assertion that its errors were prejudicial, we conclude that the errors were harmless under the applicable standards of review for prejudicial error. Regarding the court's error in excluding evidence on its grants of immunity to the three prosecution witnesses, we apply the standard of prejudice for nonstructural state law error as set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (Cal. Const., art. VI, § 13 [reversal

39

permitted only if error resulted in miscarriage of justice]; Evid. Code, § 354 [erroneous exclusion of evidence is not reversible error unless it resulted in miscarriage of justice]; *People v. Gonzalez* (2018) 5 Cal.5th 186, 195; *People v. Anzalone* (2013) 56 Cal.4th 545, 554–556 [procedural errors generally constitute mere trial error and not structural error].)  Under that standard, we will affirm a judgment unless the appellant shows there is a reasonable probability that he or she would have obtained a more favorable result at trial in the absence of the error.  (*Ibid*.; *People v. Sivongxxay* (2017) 3 Cal.5th 151, 178; *People v. Hernandez* (2011) 51 Cal.4th 733, 746.)  Similarly, reversal is generally not permitted for a nonstructural state law instructional error that did not result in a miscarriage of justice for which we apply the *Watson* standard of prejudice.  (Cal. Const., art. VI, § 13; cf. *People v. Breverman* (1998) 19 Cal.4th 142, 165, 178 [failure to instruct sua sponte in noncapital case on lesser included offenses was nonstructural error subject to *Watson* standard for prejudicial error].)  We reject Michael's and Matthew's conclusory assertion that the court's errors constituted federal constitutional, and not state law, errors for which the standard for prejudice under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) would apply.

As the People argue, the trial court's errors were harmless because the three prosecution witnesses were subject to impeachment of their credibility even in the absence of evidence regarding their grants of immunity.  In particular, Laura admitted she may have engaged in criminal conduct, but was never charged.  She also admitted she had been convicted of a felony involving moral turpitude and testified that she tried to evade law enforcement because she was on parole.  Likewise, Robert admitted he may have engaged in criminal conduct, but was never charged.  He also admitted he had been convicted of a felony involving moral turpitude.  He also

admitted that the prosecution had paid his rent and airfare from November 1, 2020 through September 1, 2021. Finally, Marc testified that the police had come to his home several times because he was using and selling drugs. He also admitted he had been convicted of a felony involving moral turpitude. Furthermore, as the People note, there was ample evidence to corroborate the testimony of the three prosecution witnesses (e.g., text messages sent by Michael and Matthew to Laura, their text messages and videos sent to each other, the "hit video," their communications with Andrea, forensic evidence tying them to the offenses, and Matthew's jail statements to Nicholas E.). Therefore, we conclude that the ample evidence impeaching each of the three witnesses' credibility and corroborating their testimony shows that it is not reasonably probable Michael or Matthew would have obtained more favorable verdicts even if the court had admitted evidence and allowed questioning on their grants of immunity. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

Regarding the court's instructional error in deleting the words "immunity or" from CALCRIM No. 226, we note that its modified instruction still included as factors in evaluating a witness's credibility whether the witness was influenced by bias and whether the witness had been convicted of a felony. In addition, the court instructed with CALCRIM No. 316, which allowed the jury to consider a witness's felony convictions in deciding the believability of his or her testimony. Because the jury was adequately instructed on bias and felony convictions in evaluating a witness's credibility and because, as discussed above, there was ample evidence corroborating the testimony of the three witnesses, we conclude that it is not reasonably probable Michael or Matthew would have obtained more favorable verdicts

41

had the court included the words "immunity or" in its instruction with CALCRIM No. 226.  (*Watson, supra*, 46 Cal.2d at p. 836.)

V

*Exclusion of Evidence on Andrea B.'s Other Relationship*

Michael and Matthew contend that the court erred by excluding evidence regarding a romantic relationship that Andrea had with another person during the period she had a relationship with Michael.  In particular, they argue that the court should not have precluded them from questioning Andrea about a relationship she had with Danny D.

A

Before trial, the prosecution filed a motion in limine requesting that the court preclude defense counsel from questioning Andrea about her relationship with Danny, whom she had represented in a separate criminal case.  The prosecution argued evidence regarding that relationship was irrelevant and would constitute inadmissible character evidence.  At the request of defense counsel, the court deferred ruling on that motion until trial.

During the prosecution's direct examination of Andrea, out of the jury's presence, Michael's counsel requested that he be allowed to cross-examine Andrea regarding her relationship with Danny.  In support of his request, he argued that an investigator's affidavit in support of a warrant asserted there was probable cause to arrest Andrea based on his belief she may be harboring Danny, a fugitive.  He argued that the fact that Andrea could face criminal charges related to Danny was one of the reasons that she could have had for providing information to the prosecution during the free talks.  When the prosecutor argued that Andrea had no knowledge of the warrant, Michael's counsel replied that Andrea knew Danny had a warrant for his arrest,

42

provided him with lodging, paid his utility bills, and had sexual relations with him.  Matthew's counsel agreed with Michael's counsel and argued that because Andrea had suggested it was a mistake and out of character for her to become involved with Michael, the jury should know she simultaneously was in a relationship with Danny, which would impact her credibility.  He also argued the jury should know that Andrea was a lawyer who violates her ethical obligations.  Because Andrea had placed her character for honesty at issue, he and Michael's counsel should be permitted to present evidence to rebut it.

The court denied their request to cross-examine Andrea regarding Danny, stating:

> "At this point, she hasn't said this is the only mistake she made. . . .  [¶]  She said it [her relationship with Michael] was a mistake.  People make more than one mistake in their life.  She hasn't said, 'This is the only mistake I've made.  This is the only time I've done something improper or that I've regretted.'  So its impeachment value doesn't exist yet."

The court then stated: "At this point it's [Evidence Code section] 352."  It indicated that if Andrea were to subsequently testify to something inconsistent (e.g., that her relationship with Michael was a "one-time thing" and she had "never done anything like this before"), then her relationship with Danny may become relevant for impeachment.  The court confirmed that it was also excluding evidence regarding Danny as to Andrea's motive to lie to the prosecution because she was facing potential charges of harboring a fugitive.  It excluded that evidence under Evidence Code section 352, explaining that it was "de minimis compared to the charges she was facing for all her conduct with the Tellechea brothers."

43

On conclusion of Andrea's direct examination, the court requested that counsel provide written statements on what they anticipated Andrea's testimony would be regarding Danny. It noted that Matthew's counsel had already submitted an email in which Andrea stated Danny was her boyfriend, was staying in an apartment with her, and she could add him to the lease if the landlord desired. The prosecution had submitted Andrea's statement denying that she was involved with criminal activity with Danny. In that statement, Andrea stated she had rented an apartment for Danny in her name and knew he had an outstanding arrest warrant, but told him to contact the public defender's office to get it recalled. She also stated she had given notice she was vacating the apartment and had terminated its utilities contract.

Citing *People v. Wheeler* (1992) 4 Cal.4th 284, the court stated that it had broad discretion whether to admit specific acts of honesty or moral turpitude for purposes of impeachment. Asked how evidence on Andrea's relationship was admissible, Matthew's counsel argued that Andrea had "put[ ] herself out as this honest person, this terribly ethical, never does anything unethical [person]" and had even told the prosecution that she never had sexual relations with Danny. He argued that the evidence showed Andrea was a dishonest person who needed to be impeached. He requested that the court allow him to ask Andrea one "simple" question: "How many boyfriends did you have in May of 2018?" Also, Michael's counsel argued that he should be allowed to question Andrea about her relationship with Danny to show she had a motive to lie during the free talks (i.e., because she had committed another criminal act by harboring Danny, a fugitive).

The prosecutor argued that Andrea's relationship with Danny would not have given her a motive to lie and that she had no obligation to report

44

him and, instead, told him to contact the public defender's office. He also argued the evidence should excluded under Evidence Code section 352 because it would involve "side issues."

The court noted that defense counsel already had evidence on which they could cross-examine Andrea and argue to the jury that she was dishonest, citing her apparent dishonesty with her office, husband, and children by not disclosing to them her relationship with Michael and her other deceitful behavior (e.g., not disclosing her involvement in procuring a weapon). The court stated that it was focusing on whether under the Evidence Code and, in particular, Evidence Code section 352, evidence on Andrea's relationship with Danny "sheds light on her credibility in a way that[ ]—the probative value is not substantially outweighed by the waste of time or sideshow or separate trial." The court stated that defense counsels' reasons for allowing them to question Andrea on her relationship with Danny constituted "frankly, . . . a traditional bad character argument. She's immoral. She's a three-timer. She lies to her children. That's not a credibility question. That's a bad character question of which the Evidence Code is crystal clear is improper." Pending subsequent questioning of Andrea outside of the jury's presence on the issue, the court noted that the only possible relevant evidence could be if she states she was living at the apartment she rented for Danny and, if she so stated, that statement could be used for impeachment as a prior inconsistent statement and, if she did not so state, the evidence would be excluded.

During a subsequent break, the court, outside the jury's presence, asked Andrea whether she had ever stayed at Danny's apartment. She answered, "No."

45

B

Evidence Code section 780 provides: "Except as otherwise provided by statute, the . . . jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his [or her] testimony at the hearing, including but not limited to any of the following: [¶] . . . [¶] (e) His character for honesty or veracity or their opposites. . . ." Even if evidence is relevant or otherwise admissible, a trial court has "discretion to exclude [that evidence] under Evidence Code section 352 'if its probative value is substantially outweighed by the probability that its admission will . . . necessitate undue consumption of time or . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*People v. Dalton* (2019) 7 Cal.5th 166, 214 (*Dalton*).)

C

Based on our review of the record, we conclude, contrary to the arguments of Michael and Matthew, that the trial court did not err by excluding evidence on Andrea's relationship with Danny. In particular, we conclude the court did not abuse its discretion under Evidence Code section 352 by excluding that evidence. The court could reasonably conclude that any probative value of evidence on Andrea's relationship with Danny would be substantially outweighed by the probability that its admission would necessitate undue consumption of time or create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352; *Dalton, supra*, 7 Cal.5th at p. 214.) The record shows the court expressly weighed the various Evidence Code section 352 factors in making its ruling to exclude the evidence. For example, it cited Evidence Code section 352 in implying that her relationship with Danny would not have

46

significant probative value in impeaching Andrea unless she were to testify inconsistently with her prior statements (e.g., if she were to testify that her relationship with Michael was a "one-time thing" and she had "never done anything like this before").  The court also weighed the "de minimis" probative value of evidence that she may have known she was harboring a fugitive (i.e., Danny) against the charges she was facing for her conduct related to the Tellechea brothers.  The court also presumably weighed the minimal probative value of evidence on her relationship with Danny against other probative evidence on which defense counsel could cross-examine Andrea and argue to the jury that she was dishonest (e.g., her apparent dishonesty with her office, husband, and children by not disclosing to them her relationship with Michael and her other deceitful behavior).  Importantly, the court concluded that under Evidence Code section 352 the probative value of evidence on Andrea's relationship with Danny regarding her credibility was "not substantially outweighed by the waste of time or sideshow or separate trial."  Therefore, the court, in effect, found that the probative value of evidence on her relationship with Danny (e.g., to show her dishonesty and/or motive to lie during the free talks) was substantially outweighed by the probability that its admission would necessitate undue consumption of time and/or create a substantial danger of confusing the issues or misleading the jury.  (Evid. Code, § 352.)  By weighing the relevant factors under Evidence Code section 352 and excluding evidence on Andrea's relationship with Danny, we conclude the court did not act in an arbitrary, capricious, or patently absurd manner.  (*Dalton*, *supra*, 7 Cal.5th at p. 214; *People v. Miles* (2020) 9 Cal.5th 513, 587–588 [abuse of discretion standard of review applied to Evidence Code section 352 ruling].)  The court reasonably concluded that it would take an inordinate amount of time and/or would confuse the jury if

evidence on Andrea's relationship with Danny were admitted and, weighing those factors against the minimal probative value of that evidence, properly exercised its discretion under Evidence Code section 352 to exclude that evidence.

Neither Michael nor Matthew carries his burden on appeal to persuade us that the court abused its discretion by excluding evidence on Andrea's relationship with Danny. In particular, we do not accept Michael's assertion that her relationship with Danny would necessarily have been covered with only a couple of short questions on cross-examination because the prosecution presumably would then need to place that relationship in context. Furthermore, contrary to his assertion, we conclude the court did not violate his Sixth Amendment right to confront Andrea when it properly exercised its discretion to exclude evidence on her relationship with Danny. (Cf. *People v. Frye* (1998) 18 Cal.4th 894, 946; *People v. Belmontes* (1988) 45 Cal.3d 744, 780; *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678–679.) Accordingly, we conclude that the court did not err by excluding evidence on Andrea's relationship with Danny.

VI

*No Prosecutorial Error*

Michael and Matthew contend that the prosecutor prejudicially erred by: (1) showing during his opening statement a slide that displayed the words "felons in possession" adjacent to their photographs; and (2) offering in evidence an exhibit (exh. 36) that displayed their photographs adjacent to two screen shots from a video recording showing two individuals fleeing from Laura's burning vehicle.

48

## A

During his opening statement (which was not reported and therefore is not part of the record on appeal), the prosecutor apparently displayed for the jury a slide showing photographs of Michael and Matthew with the words "felons in possession" adjacent to their photographs. During a subsequent break during the trial, Matthew's counsel, outside the presence of the jury, moved for a mistrial on the ground that the prosecutor had shown in large print on the monitor that Matthew and Michael had been charged with being felons in possession. He argued that based on the trial court's pretrial ruling, the prosecutor should not have referred to evidence on those charges or the fact the defendants were felons. As an alternative to a mistrial, he requested that the court sever Matthew's trial from Michael's trial because only Michael had been charged for being a felon in possession.

The court initially replied that what the attorneys stated and displayed during their opening statements was not evidence. It also stated that defense counsel had previously delayed addressing the prosecutor's argument on the felon-in-possession charges, thereby preventing it from ruling on it. In response, Matthew's counsel argued that it was the court's responsibility to make rulings on admission of evidence. He argued that the prosecutor was aware of the court's pretrial ruling precluding him from telling the jury about the fact that Matthew and Michael had prior felony convictions.

The court noted that it "was not happy" to see the prosecutor's screen with the word "felon" on it. It further noted that the issue of evidence regarding the defendants' felon status "was an unsettled issue" at the time of the prosecutor's opening statement. It then ruled on the pending in limine motion, concluding that if Michael and Matthew stipulated to their felon status, the jury would not learn about the nature of their prior felony

49

offenses, but the jury could still learn they had prior felony convictions. Matthew's counsel argued the jury nevertheless should not have seen the words "felon[s] in possession" during the prosecutor's opening statement. He argued the jury had been "poisoned" and there was "no way to unring the bell." The court replied that admissions of felony convictions would not preclude the jury from learning about their felony convictions, which was an element the prosecutor needed to prove. Accordingly, it denied the motion for a mistrial. Later during the trial, Michael and Matthew stipulated that they had been convicted of felony offenses.

B

During Andrea's trial testimony, the prosecutor showed her exhibit 36, which consisted of a slide with three portions. On the left side, an image of both Michael and Matthew from one of their social media accounts was shown, and in the middle and on the right side, two screen shots from a surveillance camera video recording were shown with individuals running from Laura's burning vehicle. When asked, Andrea confirmed that the screen shot on the left side was the same or similar to a video Matthew had sent her. She testified that it showed Michael and Matthew laughing and flashing lights from fire trucks visible in the background.

Two days later, Matthew's counsel moved for a mistrial, arguing that exhibit 36 was unduly prejudicial. The court noted that exhibit 36 had been part of the prosecutor's exhibit binder that the court had received weeks before trial and no objections had been made to it. The prosecutor argued that exhibit 36 was proper because it allowed the jury to compare the clothing that Michael and Matthew had worn that morning to the clothing worn by the unidentified individuals depicted in the surveillance recording screen shot. Reminding counsel that they should have made any objections

50

to the exhibits during its consideration of the in limine motions, the court nevertheless concluded that exhibit 36 was not improper because it was appropriate to allow the jury to compare the clothing worn by Michael and Matthew with the clothing worn by the individuals running from the scene of the fire and then decide whether Michael and Matthew were those individuals.  The court then denied the motion for a mistrial.

C

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44 (*Morales*).)  To preserve a claim of prosecutorial misconduct or error, a defendant must timely object and request a curative admonition unless an admonition would not have cured the harm caused by the misconduct or error.  (*People v. Hinton* (2006) 37 Cal.4th 839, 863 (*Hinton*); *People v. Earp* (1999) 20 Cal.4th 826, 858 (*Earp*).)  "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 (*Samayoa*).)  However, "[a] defendant will be excused from the requirement of making a timely objection and/or a request for an admonition if either would have been futile.  [Citation.]  In addition, the failure to request that the jury be admonished does not forfeit the issue for appeal if an admonition would not have cured the harm caused by the

51

misconduct or the trial court immediately overrules an objection to alleged misconduct such that the defendant has no opportunity to make such a request." (*People v. Cole* (2004) 33 Cal.4th 1158, 1201 (*Cole*).)

Absent a fundamentally unfair trial under the federal Constitution, prosecutorial misconduct or error does not require reversal of the judgment unless it was prejudicial under state law, i.e., it is reasonably probable the defendant would have obtained a more favorable verdict absent the misconduct or error. (*People v. Crew* (2003) 31 Cal.4th 822, 839 (*Crew*); *People v. Bell* (1989) 49 Cal.3d 502, 534, 542 (*Bell*); *People v. Castillo* (2008) 168 Cal.App.4th 364, 386 (*Castillo*).) If the prosecutorial misconduct or error renders the defendant's trial fundamentally unfair under the federal Constitution, reversal of the judgment is required unless the misconduct or error is harmless beyond a reasonable doubt. (*Castillo*, at pp. 386–387; *People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1323–1324.)

D

We conclude that Michael and Matthew waived or forfeited their claim of prosecutorial misconduct regarding the prosecutor's display during his opening statement of a slide bearing the words "felons in possession" adjacent to their photographs because they did not timely object to that display and request a curative admonition. (*Hinton, supra,* 37 Cal.4th at p. 863; *People v. Guerra* (2006) 37 Cal.4th 1067, 1124 (*Guerra*); *Earp, supra,* 20 Cal.4th at p. 858; *Samayoa, supra,* 15 Cal.4th at p. 841.) The record shows that an objection was not made until a subsequent break during the testimony of the prosecution's third witness, which was long after the prosecutor had displayed the slide during his opening statement. And then when Matthew's counsel finally objected to the slide, he sought only a mistrial and did not request a curative admonition. We conclude that by not timely objecting to

the prosecutor's display of the challenged slide and not timely requesting a curative admonition, Michael and Matthew waived or forfeited any purported prosecutorial misconduct or error related to its display. (*Hinton*, at p. 863; *Guerra*, at p. 1124; *Earp*, at p. 858; *Samayoa*, at p. 841.)

Nevertheless, assuming arguendo that they did not waive or forfeit their claim, we conclude, contrary to their assertion, that the prosecutor's display of that slide did not deprive them of a fundamentally fair trial under the federal Constitution (i.e., it did not infect the trial with such unfairness as to make their convictions denials of due process). (*Morales*, *supra*, 25 Cal.4th at p. 44.) They received a jury trial, were allowed to and did cross-examine witnesses against them, were allowed to and did present the testimony of witnesses and evidence in their defense, and were not denied any of the other rights to which a criminal defendant is entitled under the federal Constitution. They do not persuade otherwise.

We further conclude that any error by the prosecutor in displaying the slide did not constitute prosecutorial misconduct or error under the state standard (i.e., it did not involve the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury). (*Morales*, *supra*, 25 Cal.4th at p. 44.) Based on our review of the record, it appears that the prosecutor, contrary to the trial court's pretrial ruling, mistakenly failed to remove the words "felons in possession" from the slide with the photographs of Michael and Matthew shown during his opening statement. Absent any affirmative evidence showing otherwise, we infer that the prosecutor's mistake was merely an oversight and did not constitute the use of deceptive or reprehensible methods to attempt to persuade the jury. (*Ibid*.) Therefore, the prosecutor's challenged conduct in showing the slide did not constitute prosecutorial misconduct or error under state law. (*Ibid*.) Finally, we

53

conclude that any such purported prosecutorial misconduct or error under state law did not prejudice either Michael or Matthew because it is not reasonably probable either of them would have obtained a more favorable verdict absent the misconduct or error. (*Crew*, *supra*, 31 Cal.4th at p. 839; *Bell*, *supra*, 49 Cal.3d at pp. 534, 542; *Castillo*, *supra*, 168 Cal.App.4th at p. 386.) As the trial court implied in denying Matthew's motion for a mistrial, it had instructed the jury that nothing in counsels' opening statements was evidence. The record shows that before opening statements, the court instructed the jury as follows: "[W]hat the attorneys say is not evidence. That doesn't mean it's not important, but it does mean it is not evidence. So it offers no information that you can apply in your tasks of looking at the crimes and the elements of the offenses, et cetera." Furthermore, its jury instructions at the close of the trial included CALCRIM No. 222, which stated in part: " 'Evidence' is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence. [¶] Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. . . ." We presume the jurors followed those instructions and, in so doing, did not consider anything the prosecutor stated or displayed during his opening statement to be evidence which they could consider in deciding Michael's or Matthew's guilt of the charged offenses. Accordingly, we presume the jurors did not consider the words "felons in possession" shown on the slide with their photographs as evidence in reaching their verdicts. Therefore, we conclude it is not reasonably probable they would have obtained more favorable verdicts had those words been deleted from that slide and, based thereon, conclude there

54

was no reversible prosecutorial misconduct or error under state law. (*Crew*, at p. 839; *Bell*, at pp. 534, 542; *Castillo*, at p. 386.)

E

We likewise conclude that Michael and Matthew waived or forfeited their claim of prosecutorial misconduct regarding the prosecutor's offer of exhibit 36 into evidence because they did not timely object to admission of that exhibit and request a curative admonition. (*Hinton*, *supra*, 37 Cal.4th at p. 863; *Guerra*, *supra*, 37 Cal.4th at p. 1124; *Earp*, *supra*, 20 Cal.4th at p. 858; *Samayoa*, *supra*, 15 Cal.4th at p. 841.) As discussed above, without any objection by Michael or Matthew, the prosecutor showed Andrea exhibit 36, which consisted of a slide with three portions. She described what was depicted on that slide and the video that Matthew had sent to her. It was not until two days later that Matthew's counsel moved for a mistrial, arguing that exhibit 36 was unduly prejudicial. The court noted that exhibit 36 had been part of the prosecutor's exhibit binder that the court had received weeks before trial and no objections had been made to it. We conclude that by not timely objecting to exhibit 36 either before trial or at the time the prosecutor presented it to Andrea, Michael and Matthew waived or forfeited any purported prosecutorial misconduct or error related to the admission of that exhibit. (*Hinton*, at p. 863; *Guerra*, at p. 1124; *Earp*, at p. 858; *Samayoa*, at p. 841.)

Nevertheless, assuming arguendo that they did not waive or forfeit their claim, we conclude, contrary to their assertion, that the prosecutor's display of that slide did not deprive them of a fundamentally fair trial under the federal Constitution (i.e., it did not infect the trial with such unfairness as to make their convictions denials of due process). (*Morales*, *supra*, 25 Cal.4th at p. 44.) As the People argue, exhibit 36 was not improper and the

55

prosecutor did not err by offering it into evidence.  Michael and Matthew do not appear to argue that each of the three portions of exhibit 36 could not have been properly admitted into evidence had they been separated into three separate exhibits.  On the contrary, viewed separately, we conclude each of those portions would have been properly admitted as independent exhibits.  And if those three exhibits had been admitted in evidence, the prosecutor would have been able to properly show those three exhibits to Andrea and ask her to discuss them and then argue in closing that the jury should compare the three exhibits in determining whether Michael and Matthew were the individuals shown in the screen shot from the surveillance video recording.  Because the prosecutor could have properly done with three separate exhibits what he actually did with one combination exhibit, we conclude he did not: (1) deprive them of a fundamentally fair trial under the federal Constitution (i.e., it did not infect the trial with such unfairness as to make their convictions denials of due process); or (2) commit prosecutorial misconduct or error under the state law standard (i.e., it did not involve the use of deceptive or reprehensible methods to attempt to persuade the jury).  (*Ibid*.)  Michael and Matthew do not persuade us to reach a contrary conclusion.  Because the prosecutor did not commit error in offering exhibit 36, we need not, and do not, address the question of whether they were prejudiced by that error under either the federal standard or state law standard.

## VII

*Substantial Evidence Supports Matthew's Section 496d Conviction*

Matthew contends that substantial evidence does not support his conviction of receiving a stolen vehicle (§ 496d).  In particular, he argues there is insufficient evidence to support findings that he knew the vehicle

56

(i.e., Laura's white Range Rover) was stolen and that he was in possession of it.

A

Section 496d, subdivision (a) provides: "Every person who buys or receives any motor vehicle . . . that has been stolen or that has been obtained in any manner constituting theft or extortion, *knowing the property to be stolen or obtained*, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any motor vehicle . . . from the owner, *knowing the property to be so stolen or obtained*, shall be punished . . . ." (Italics added.) "To sustain a conviction for receiving stolen property, the prosecution must prove: (1) the property was stolen; (2) the defendant *knew the property was stolen* . . . ; and, (3) the defendant had possession of the stolen property." (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1425, italics added.) "[T]he second element of the offense is knowledge that the property was stolen, which is a specific mental state." (*Ibid*.) Therefore, if the defendant received a stolen vehicle by mistake without knowing it was stolen, that defendant lacks the required mental state of knowledge and cannot be convicted of receiving a stolen vehicle. (*Id.* at p. 1427.) "The elements of receipt of stolen property . . . do not require the defendant to have engaged in" taking of that property. (*People v. Orozco* (2020) 9 Cal.5th 111, 121–122.)

As discussed above, substantial evidence is not synonymous with any evidence or a mere scintilla of evidence, but is only evidence that is of ponderable legal significance, reasonable in nature, credible, and of solid value. (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 1005–1006.) The testimony of a single credible witness may constitute substantial evidence. (*Mix*, *supra*, 14 Cal.3d at p. 614.) In applying the substantial evidence standard of review, we accept all evidence, and all reasonable inferences

57

therefrom, to support the jury's finding and do not determine whether there is substantial evidence to support a contrary finding.  (*Schmidt, supra*, 44 Cal.App.5th at pp. 581–582.)

B

In arguing that substantial evidence does not support his section 496d conviction of receiving a stolen vehicle, Matthew argues there is insufficient evidence to support the second element of knowledge and third element of possession.  However, in so arguing, he cites evidence and inferences therefrom that would have supported contrary findings that he did not know Laura's white Range Rover was stolen and that he did not possess it.  In particular, he summarizes Laura's trial testimony and then argues that she "was not a reliable witness and her testimony was inconsistent," citing the fact that she did not report her stolen vehicle to police.  He also argues the evidence showed that Michael, and not he, was in possession of Laura's Range Rover.  By so arguing, he misconstrues and/or misapplies the substantial evidence standard of review.  In applying the substantial evidence standard of review, we accept all evidence, and all reasonable inferences therefrom, to support the jury's findings and do not determine whether there is substantial evidence to support contrary findings.  (*Schmidt, supra*, 44 Cal.App.5th at pp. 581–582.)  Based on our review of the record, we conclude there is substantial evidence to support Matthew's section 496d conviction, including underlying findings by the jury that he knew Laura's white Range Rover was stolen and that he possessed it or withheld it from her.  In particular, Laura testified that in December 2017 she bought a white Range Rover for herself and a blue Range Rover for Matthew, the price for which he was to pay her back.  She testified that she left her white Range Rover at the dealership for repairs and a few days later, Michael or Matthew

picked it up from the dealership and Michael began driving it. Later in December, Laura sent Matthew a text message stating that she wanted her Range Rover back. Matthew replied that Michael, and not he, had the white Range Rover, but he stated he would get it to her. On December 17, 2017, Matthew sent Michael a text message in which he stated in part: "[Laura] sent me rat text about you treating [*sic*] her life and wanting her Rover back now. I will forward the text messages to you. Mikey, seriously, drop that rat's car back ASAP."

On February 21, 2018, Laura sent a text message to Matthew, stating: "I want my car back." Matthew replied by text: "[Y]ou think you got it like that LOL, LOL. You already know what the deal is. Also you dumb fuck. Those pearly gates are screaming for you." Later that day, Laura sent text messages to Matthew, stating: " 'Your brother picked up my vehicle from the dealership without my permission, and I still have not received it.' " and " 'I want my car, skateboard, and chairs.' " The following day, Matthew replied by text: "You're a crazy bitch. You're nuts. You owe me [$]66,000 in cash for hit-for-hire [video]," and "I have nothing that belongs to you." Laura replied in part: "I do own a Rover. I have the title and key, and your brother picked it up without my permission," and "Are you telling me I owe you money for the repairs you got without my permission on my vehicle, the Rover, and telling me we need to talk about your meetings and money to get my vehicle back is extortion and also illegal. I want my property back." Matthew replied: "Fuck you, bitch." In sum, the above evidence, along with other evidence admitted at trial, constitutes substantial evidence to support Matthew's section 496d conviction, including underlying findings by the jury that Laura's white Range Rover was stolen, that Matthew knew her white

59

Range Rover was stolen, and that he possessed it or withheld it from her. Matthew has not carried his burden on appeal to persuade us otherwise.

## VIII

### *The Prosecutor Did Not Commit Any Brady Error*

Michael contends, and Matthew joins in his contention, that the prosecutor erred under *Brady*, *supra*, 373 U.S. 83, by not disclosing to him the entire video recording of the shooting incident, which recording was made by their home surveillance camera. However, in so arguing, they merely speculate, and do not show, that the prosecution or its investigators possessed a copy of that video recording and withheld it from them, except for a screen shot from that video recording.

### A

During Andrea's free talks, she told investigators that Michael had told her about the shooting incident regarding Marc and had shown her a video taken from his surveillance equipment, stating Michael thought the video would be helpful to him. Andrea stated that she tried to load the video recording onto a blank USB drive, but was unsuccessful in doing so.

At Michael's and Matthew's preliminary hearing, Matthew's counsel stated that he needed to view the video recording. The prosecutor replied that Andrea's reference to the video recording was to the recording taken by Michael's and Matthew's home surveillance equipment, which had been downloaded and provided to them in discovery. Michael's counsel stated it was his understanding that Andrea had copied the video recording footage onto her cell phone and because it might be exculpatory, they should receive it. Matthew's counsel stated that the video recording provided to him by the prosecution was only for the month of June because, according to Andrea, the home surveillance video recordings were deleted after 30 days. He further

60

stated that when he requested additional footage from the prosecutor, the prosecutor explained that he had only a picture of a video clip and the video recording was gone. Matthew's counsel asserted that Andrea either had a copy of the video recording or took a video of the video recording on her phone. The prosecutor disagreed, stating that Andrea had never stated she recorded the video, but only that she saw the video on Michael's and Matthew's surveillance equipment. The prosecutor represented to the court that his investigators had downloaded everything that was on the surveillance equipment and provided that download to defense counsel. The court requested, and the prosecutor agreed to ask, that the discovery special master review all of the video files to determine whether the video recording in question existed.[12]

At trial, Andrea testified that Michael and Matthew had a "pretty sophisticated surveillance" system. She further testified that the surveillance system did not save any video recordings. She stated that she believed the still image shown on exhibit 64 had been taken from the video recording footage. She then described what she recalled seeing on the video recording about the locations of the white Range Rover and Marc's Cadillac at the time of the shooting.

After the jury returned its verdicts, Michael's counsel filed a motion for a new trial, asserting, among other things, that the prosecution's investigators (i.e., the San Diego County District Attorney's Digital Investigation Division, or "CATCH" team) had been in possession of the video recording of the shooting incident all along and because the prosecution committed *Brady* error, Michael should be given a new trial so a defense

---

[12] The People represent that the record does not include any further information regarding that request or whether the discovery special master reviewed all of the video files and, if so, what he or she found.

61

forensic expert could review the actual surveillance equipment to determine whether there was footage containing exculpatory material.

The prosecutor responded that a thumb drive had been recovered from the defendants' possession and the prosecution had copied it and given a copy to their counsel in October 2018. The prosecutor represented to the court that the thumb drive contained only one second of the video, which was offered in evidence as exhibit 64. The prosecutor represented that the surveillance equipment had also been recovered and its data was duplicated and turned over to defense counsel years before trial. Although defense counsel initially indicated that they were interested in retaining an expert, they later stated they would rather have their investigator meet with a member of the CATCH team, and, then shortly before trial, they obtained the equipment to examine it themselves. He represented that there had been no indication that anything would be recovered from the surveillance equipment and argued it was pure speculation by defense counsel that there would be.

The court noted that exhibit 64 was a screen shot from the video recording and not a portion of the recording itself and that the prosecution did not have the original video recording. It stated that the issue for it to decide was a factual question of whether the original video recording was still in existence. An expert's opinion that the recording "might be" in existence was not terribly compelling to the court. It further stated that Michael and Matthew were the only persons who knew whether the original video recording had been erased or destroyed. After hearing arguments by counsel, the court denied the motion for new trial.

B

Under *Brady*, *supra*, 373 U.S. 83, and its progeny, "the prosecution has a constitutional duty to disclose to the defense material exculpatory evidence, including potential impeaching evidence.  The duty extends to evidence known to others acting on the prosecution's behalf, including the police." (*People v. Superior Court (Johnson)* (2015) 61 Cal.4th 696, 709 (*Johnson*).) "For *Brady* purposes, evidence is material if it is reasonably probable its disclosure would alter the outcome of trial." (*Id*. at pp. 709–710.)  "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." (*Strickler v. Greene* (1999) 527 U.S. 263, 281–282 (*Strickler*).)  On appeal, it is the appellant's burden to show a *Brady* violation. (*Id*. at p. 289.)  We independently review the record in determining whether there was a *Brady* violation, but, in so doing, give great weight to the trial court's findings that are supported by substantial evidence. (*People v. Masters* (2016) 62 Cal.4th 1019, 1067 (*Masters*).)

C

Contrary to Michael's and Matthew's assertion, the record does not support a reasonable inference that any video recording of the shooting incident existed on their home surveillance system when it was recovered during a search of their home.  At the hearing on their motion for new trial, the prosecutor represented to the court that he had possessed only the screen shot taken on Andrea's phone (i.e., exhibit 64) when she viewed the video recording shortly after the shooting incident.  At the preliminary hearing, Matthew's counsel represented that their surveillance system deleted video recordings after 30 days.  Because the shooting incident occurred on April 5,

63

2018, and Michael was not arrested until late June 2018 (about 11 weeks later), the video recording of the shooting incident presumably would have been deleted by that time. Also at trial, Andrea testified that Michael had played the video recording for her and the surveillance system had not saved that recording. Finally, the trial court implicitly, if not expressly, found that no such video recording existed at the time the home surveillance system was recovered and substantial evidence supports that finding, which we give great weight in our determination. (*Masters*, *supra*, 62 Cal.4th at p. 1067.)

Michael and Matthew have not cited any evidence showing that the prosecution or its agents were ever in possession of a video recording of the shooting incident. In his opening appellant's brief, Michael even concedes: "It is possible that no mischief occurred here, and that what actually existed was a single screenshot of the alley found on the thumb drive[.]" We conclude that Michael's *mere speculation* that a video recording may have existed on his home surveillance system when it was recovered by law enforcement and that the prosecution or its agents may have possessed that recording and failed to produce it in discovery is insufficient to carry his burden to prove a *Brady* violation occurred. Furthermore, his assertion that the circumstances surrounding the deletion of video recording were "suspicious" is likewise insufficient to support his request that his convictions be reversed and a hearing be held on whether a defense forensic expert could attempt to recover any video recordings from the home surveillance system. As the People note, a defense expert admitted in his declaration that he had access to the home surveillance system long before the trial began, but did not conduct a forensic examination of it due to other "administrative" duties. That expert further indicated that he was unable to determine with any degree of certainty whether video recording footage could, in fact, be recovered from the system.

64

"Because it appears that no evidence was in fact 'suppressed' and that defense counsel had adequate time to conduct additional investigation, [Michael's and Matthew's] *Brady* claim is without merit." (*People v. Williams* (2013) 58 Cal.4th 197, 257–258.) In sum, we conclude that Michael and Matthew have failed to carry their burden to prove that there was a *Brady* violation by the prosecution by not disclosing a video recording of the shooting incident which purportedly existed on their home surveillance system at the time it was recovered and possessed by the prosecution or its agents. (*Ibid*.; *Johnson, supra*, 61 Cal.4th at p. 709; *Strickler, supra*, 527 U.S. at pp. 281–282.)

IX

*Trial Court Did Not Abuse Its Discretion by Allowing*
*Matthew's Niece to Read a Letter at His Sentencing*

Matthew contends that the trial court prejudicially erred by allowing his niece to read a letter at his sentencing in which she described his sexual abuse of her as a child. He argues her letter should have been excluded as irrelevant and inflammatory evidence.

A

At Matthew's sentencing, Matthew submitted evidence in mitigation, including letters from family members and friends describing his difficult childhood and stating that he was a kind and loving person (e.g., he was "considerate of others" and was a "loving young [man]"). Matthew also spoke at his sentencing, stating: "I never hurt anybody, I never did any violence."

Overruling an objection by Matthew's counsel, the trial court allowed his niece to read a letter that she had submitted to the court before his sentencing. In that letter, she stated that about 10 years earlier when she was 13 years old, Matthew manipulated her and forced her to kiss and touch him inappropriately. She asked the court to sentence him to the maximum

65

punishment for what he had done in order to protect any future victims of Matthew if he were to be released from custody.

## B

As Matthew concedes, sentencing courts have wide discretion in weighing aggravating and mitigating factors. (*People v. Avalos* (1996) 47 Cal.App.4th 1569, 1582.) In particular, the court may consider whether a defendant poses a danger to society, as well as any other factors statutorily declared to be circumstances in aggravation or which reasonably relate to the defendant. (Cal. Rules of Court, rule 4.421(b)(1), (c).) In particular, a sentencing court may consider whether a "defendant has engaged in violent conduct that indicates a serious danger to society." (Cal. Rule of Court, rule 4.421(b)(1).) However, at least in capital cases, evidence of a defendant's background, character, or conduct that is not probative of any specific sentencing factor is irrelevant and inadmissible. (*People v. Nelson* (2011) 51 Cal.4th 198, 222 (*Nelson*).) Nonetheless, evidence offered as rebuttal to defense evidence in mitigation need not relate to any specific aggravating factor. (*Id.* at pp. 222–223.)

## C

Contrary to Matthew's assertion, the trial court properly exercised its discretion by allowing his niece to read her letter at his sentencing. Specifically, the court could reasonably conclude that her letter described conduct by Matthew that rebutted his mitigating evidence that he was considerate of others, a loving young man, and had never hurt anybody. *Nelson, supra,* 51 Cal.4th at pp. 222–223.) By allowing such rebuttal evidence, the court did not abuse its discretion at his sentencing.

In any event, Matthew has not carried his burden on appeal to show that the court's purported error was prejudicial (i.e., it is reasonably probable

66

that he would have obtained a more favorable result had that evidence been excluded).  When the court admitted the niece's letter in evidence, it reminded Matthew's counsel that it was familiar with the California Rules of Court and relevance requirements and assured him it would make its sentencing decision within those parameters.  Although the court noted there was "a good argument" for it to impose the upper term, it ultimately imposed only the middle term sentence on Matthew's base offense (arson of property).  Matthew does not show it is reasonably probable the court would have imposed a lesser sentence had it excluded his niece's letter.  (*People v. Sanchez* (1994) 23 Cal.App.4th 1680, 1684.)

X

*No Cumulative Prejudicial Error*

Because, as we have concluded above, the trial court erred only regarding its failure to instruct the jurors that certain prosecution witnesses had been granted immunity and that factor could be considered in weighing those witnesses' credibility, there were no multiple errors from which Michael and Matthew could have suffered any cumulative prejudice.[13]  (*People v. Grimes* (2016) 1 Cal.5th 698, 737 [if there is nothing to cumulate, there can be no cumulative prejudice]; see also, *People v. DeHoyos* (2013) 57 Cal.4th 79, 155 [where each error was harmless when considered separately, court concluded their cumulative effect was likewise harmless and did not warrant reversal].)  Therefore, we reject their contention that cumulative error

---

[13]   As we conclude above, we do not consider the prosecutor's inadvertent mistake during his opening statement by showing the words "felons in possession" on the slide with their photographs to constitute prosecutorial misconduct or error.  Therefore, that mistake is disregarded in a cumulative prejudice analysis.

deprived them of their constitutional rights to due process and a fair trial. (*People v. Mireles* (2018) 21 Cal.App.5th 237, 249.)

XI

*Modification of Matthew's Assessments and Fines*

Matthew contends, and the People concede, that the trial court erred in imposing certain assessments and fines and his abstract of judgment should be amended to reflect the correct amounts.

A

At Matthew's sentencing, the court imposed, among other things, the following: (1) a court operations assessment of $280 (§ 1465.8); (2) a court facilities assessment of $210 (Gov. Code, § 70373); and (3) a theft conviction fine of $41 (§ 1202.5).  Matthew argues that because he was convicted of only *six* [*sic*] offenses, the court operations assessment should have been $240, and not $280, and the court facilities assessment should have been $180, and not $210.  (§ 1465.8, subd. (a)(1) [assessment of $40 for each criminal conviction]; Gov. Code, § 70373, subd. (a)(1) [assessment of $30 for each criminal conviction].)  However, contrary to Matthew's assertion and the People's concession, the record clearly shows he was convicted of *seven*, and not six, offenses (i.e., counts 1, 2, 4, 6, 7, 12, & 13).  Therefore, the premise of his argument regarding the two assessments is faulty.  Accordingly, we conclude that the trial court correctly imposed the $280 assessment under section 1465.8, subdivision (a)(1) (i.e., $40 multiplied by 7) and $210 assessment under Government Code section 70373, subdivision (a)(1) (i.e., $30 multiplied by 7).

68

B

Matthew also contends, and the People concede, that because he was not convicted of a theft offense within the meaning of section 1202.5, the $41 fine under that statute was inapplicable and should not have been imposed by the trial court.  (§ 1202.5, subd. (a).)  We agree.  Accordingly, we modify his sentence to strike the $41 fine imposed under section 1202.5.  The San Diego County Superior Court clerk is directed to issue an amended abstract of judgment reflecting that modification of Matthew's sentence and to forward a copy of it to the California Department of Corrections and Rehabilitation.

## DISPOSITION

The judgment entered as to Michael Tellechea is affirmed. The judgment entered as to Matthew Tellechea is modified to strike the section 1202.5 fine of $41. As so modified, his judgment is affirmed. The San Diego County Superior Court clerk is directed to issue an amended abstract of judgment reflecting the modification of Matthew's judgment and to forward a copy of it to the California Department of Corrections and Rehabilitation.

O'ROURKE, Acting P. J.

WE CONCUR:

KELETY, J.

CASTILLO, J.

70